UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES,

    -against-

JIMMY COURNOYER,

              Defendant
------------------------------------------------------------x

**MEMORANDUM AND ORDER**

12-CR-65

**TOWNES, United States District Judge:**

       Jimmy Cournoyer ("Cournoyer" or "Defendant") is one of several defendants charged in an international narcotics conspiracy. He has filed motions (1) to dismiss the indictment without prejudice for violation of due process, violation of international law, and unlawful attainment of jurisdiction over the person; (2) to sever; and (3) to transfer the case to the Northern District of New York. For the reasons stated below, Defendant's motions are denied in their entirety.

**BACKGROUND**

       On January 20, 2012, a Grand Jury sitting in this district returned an indictment charging Cournoyer and others in a conspiracy to import narcotics from Canada via the Akwesasne Native American Reservation, which straddles the international border in upstate New York. The indictment charges Cournoyer with, *inter alia*, engaging in a continuing criminal enterprise, conspiracy to import marijuana, conspiracy to distribute marijuana, conspiracy to export cocaine, conspiracy to distribute cocaine, use of firearms, and money laundering. The indictment further gives notice that, upon conviction, the government will seek forfeiture of proceeds in the sum of $800,000,000.

Following the indictment, the U.S. requested the issuance of a Red Notice through the International Criminal Police Organization, popularly known as "Interpol." On February 16th, 2012, Defendant flew from Canada to Cancun, Mexico. Mexican authorities denied Defendant entry into Mexico and placed him under detention. One day later, Mexican authorities forced Defendant to board a flight to Canada, with a scheduled stop in Houston, Texas. In Houston, American agents boarded the flight and placed Defendant under arrest.

Defendant and the government offer disparate accounts of what occurred during Defendant's detention in Mexico. The government asserts that, over twenty-four hours, Mexican authorities made four attempts to expel Defendant by placing him on flights to Canada, each flight having a stop-over in the U.S. *Government's Response in Opposition to Defendant Jimmy Cournoyer's Pretrial Motions*, p. 10. On the first three occasions Cournoyer became physically violent and had to be removed from the flight. *Id.* On the fourth occasion, "Mexican authorities finally succeeded in expelling Cournoyer by sending several Mexican law enforcement officers onto a commercial flight to accompany him." *Id.* p. 11.

Defendant, on the other hand, asserts that he was detained by Mexican authorities "for over thirty-two hours without food, drink or bedding." *Defendant Jimmy Cournoyer's Memorandum of Law in Support of his Motion to Dismiss*, p. 2. Mexican authorities locked Defendant in a detention room, told Defendant that he was on a "blacklist," jeered at Defendant "in order to exhaust and distress [Defendant] so that he [might] be coerced into boarding a flight to the United States," and denied Defendant access to the Canadian Embassy and an attorney. *Id.* pp. 2-4. A Mexican officer told Cournoyer that if he did not board the next plane to Los Angeles, he would suffer repercussions, "which [Cournoyer] believed to mean that he would be killed." *Id.* p. 3 Finally, "twenty armed guards stormed [Cournoyer's] cell."*Id.* p. 4. One of the guards

"stomped" on Cournoyer's hand. *Id.* Another guard "choked [Cournoyer] to a near loss of consciousness. *Id.* p. 5. The guards covered Cournoyer's head with a hood and escorted Cournoyer onto a plane where Cournoyer "was seated in the last row with his hands and feet shackled together and to the floor, forcing [Cournoyer's] body to hunch over so that his head was in his lap." *Id.* Defendant claims that the Mexican authorities were "operating under the explicit direction of the United States government," *id.* p. 2, and that the actions of the Mexican authorities constitute "physical and mental torture," warranting dismissal of the indictment, *id.* p. 5. *See also Reply Memorandum in Further Support of Jimmy Cournoyer's Motion to Dismiss*, pp. 1-4.

**DISCUSSION**

    **1. Motion to Dismiss the Indictment**

Cournoyer requests that this court dismiss the indictment and claims violation of his rights under the Due Process Clause, international law, and the Fourth Amendment. Each of these claims will be dealt with in turn.

        **a.    Due Process**

Due process does not afford a criminal defendant a right to exclude his own body from the jurisdiction of a court. *See Frisbie v. Collins*, 342 U.S. 519 at 522 (1952) ("[T]he power of a court to try a person for [a] crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a forcible abduction.") (citing *Ker v. Illinois*, 119 U.S. 436 (1886)); *United States v. Crews*, 445 U.S. 463, 474 (1980) ("An illegal arrest, without more, has never been viewed as a bar to subsequent prosecution…. [The defendant] is not himself a suppressible 'fruit,' and the illegality of his detention cannot deprive the Government of the

3

opportunity to prove his guilt through the introduction of evidence wholly untainted by the police misconduct."); *United States v. Alvarez-Machain*, 504 U.S. 655, 662 (1992) (reaffirming *Ker-Frisbie* doctrine); *Brown v. Doe*, 2 F.3d 1236, 1243 (2d Cir. 1993) (noting that "there is no authority for barring the prosecution of a defendant who was illegally taken into custody"); *U.S. v. Yousef*, 2011 WL 2899244 *6 (S.D.N.Y 2011) ("[T]he use of unconventional methods to secure a defendant's appearance in the United States does not strip the Government of the power to prosecute that defendant…. [T]here is no exclusionary rule relative to the defendant himself.") (Keenan, J.); *U.S. v. Umeh*, 762 F.Supp.2d 658, 661-662 (S.D.N.Y. 2011) ("[W]hile police brutality or other misconduct may lead to suppression of a defendant's statements or other evidence garnered thereby, it does not lead to the dismissal of the indictment.") (Rakoff, J.); *U.S. v. Ghailani*, 751 F.Supp.2d 502, 506 (S.D.N.Y. 2010) ("[T]he Court explicitly has refused to adopt an exclusionary rule that would operate on the defendant's person.") (Kaplan, J.).

Faced with this weight of precedent, Defendant centers his argument on the Second Circuit case of *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974). Before his trial on narcotics charges, Toscanino, a citizen of Italy, offered to prove that he had been kidnapped in Uruguay, brought to Brazil, and there tortured for seventeen days by agents of the United States government. *Toscanino*, 500 F.2d at 268-271. The district court denied Toscanino's motion without a hearing and Toscanino was convicted. *Id*. The Second Circuit held that "due process [requires] a court to divest itself of jurisdiction over the person of a defendant where it has been acquired as a result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights." *Id.* at 275. The court remanded the case with instructions that the district court hold an evidentiary hearing "if [Toscanino] offers some credible supporting evidence, including specifically evidence that the action was taken by or at the direction of

United States officials." *Id.* at 281. On remand, the district court held that Toscanino had failed to put forward credible evidence and denied the request for an evidentiary hearing. *United States v. Toscanino*, 398 F.Supp. 916, 917 (E.D.N.Y. 1975).

Although *Toscanino* has never been overruled, it is questionable whether it is still good law. *See Umeh*, 762 F.Supp.2d at 663 ("[I]t is reasonably clear that *Toscanino* is no longer good law."); *Ghailani*, 751 F.Supp.2d at 507 (noting that "it is doubtful that *Toscanino* remains authoritative"). Indeed, a year after *Toscanino* the Second Circuit essentially limited *Toscanino* to its "shocking and outrageous" facts, stating that it "did not intend to suggest [in *Toscanino*] that any irregularity in the circumstances of a defendant's arrival in the jurisdiction would vitiate the proceedings of the criminal court." *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 65 (2d Cir. 1975) (rejecting claim that unlawful abduction without torture required dismissal). In the subsequent decades, no court has ever applied *Toscanino* to dismiss an indictment, and the authority of the decision has been eroded by the ill-favor to which its legal premises have fallen.

The first premise of *Toscanino* was that the *Ker-Frisbie* doctrine could "[not] be reconciled with the Supreme Court's expansion of the concept of due process." *Toscanino*, 500 F.2d at 275 (citing *Mapp v. Ohio*, 367 U.S. 643 (1961), *Wong Sun v. United States*, 371 U.S. 471 (1963), and *Miranda v. Arizona*, 384 U.S. 436 (1966)). However, the Supreme Court's repeated reaffirmations of the *Ker-Frisbie* doctrine in the intervening years have given this premise a hollow ring. *See Alvarez-Machain*, 504 U.S. at 669-662; *Immigration & Naturalization Serv. v. Lopez-Mendoza*, 468 U.S. 1032, 1039-1040 (1984); *Crews*, 445 U.S. at 474; *Stone v. Powell*, 428 U.S. 465, 485 (1976); *Gerstein v. Pugh*, 420 U.S. 103, 119 (1975). The second premise of *Toscanino* was that *Rochin v. California*, 342 U.S. 165 (1952) grants courts a roving power to "bar prosecution altogether where it resulted from flagrantly illegal law enforcement practices."

5

*Toscanino*, 500 F.2d at 274 (citing *United States v. Russell*, 411 U.S. 423, 431-432 (1973)). This might have been a plausible reading of Justice Frankfurter's opinion in 1952, or indeed in 1974, but not in 2012. In *Brown*, for example, the Second Circuit itself said that "*Rochin* stands at most for the proposition that a prosecution may effectively be foreclosed by exclusion of evidence tainted by a Fourth Amendment violation." *Brown*, 2 F.3d at 1243.[1] With its legal foundation removed, *Toscanino* is no longer authoritative.

However, even assuming that *Toscanino* remains good law, Cournoyer is not entitled to an evidentiary hearing. First, Cournoyer does not allege conduct remotely comparable to the deliberate and prolonged torture alleged in *Toscanino*. *See Lujan*, 510 F.2d at 66 (noting that the alleged governmental misconduct "pales in comparison" to that alleged in *Toscanino*); *United States v. Awadallah*, 202 F.Supp.2d 17, 42 (S.D.N.Y. 2002) (physical and verbal abuse of material witness prior to Grand Jury testimony concerning September 11th attacks did not require dismissal) (Scheindlin, J.). *See also United States v. Cordero*, 668 F.2d 32, 37 (1st Cir. 1981) (declining to apply *Toscanino* where defendant was subjected to poor treatment in Panamanian jail before being handed over to U.S. authorities) (Breyer, J.). Second, while Cournoyer has plausibly alleged that the U.S. and Mexican governments coordinated the transfer of custody, it does not therefore follow that abusive conduct by the Mexican authorities was at the direction of the U.S. government. *See Yousef*, 2011 WL 2899244 *8 (noting that it was "obvious" that the U.S. and Honduras cooperated in transferring the defendant, but hardly obvious that the U.S. "contrived the entire operation"). Third, even if Cournoyer could show

---

[1] In *Brown*, a habeas corpus case arising from a robbery conviction entered in New York Supreme Court, the petitioner alleged that he had been brutally beaten in Rockland County Jail while awaiting criminal proceedings. *Brown*, 2 F.3d 1236-1242. Therefore, *Brown* is arguably distinguishable from the instant case on the grounds that (1) a federal court has no general supervisory power over state law enforcement, and (2) the beating inflicted in *Brown* did not serve to bring the defendant within the jurisdiction of the court. These are not, however, powerful distinctions, and defendant Cournoyer does not raise them.

outrageous conduct by agents of the U.S. government, he would not be able to show that such conduct was a but-for cause of his presence inside the jurisdiction of the this court. *See Ghailani*, 751 F.Supp.2d at 507 (holding that, to whatever extent *Toscanino* is authoritative, it is limited to situations in which the unlawful governmental conduct was a but-for cause of any resulting conviction). *Cf. Hudson v. Michigan*, 547 U.S. 586, 591-592 (2006) (holding that exclusion of evidence is only warranted where illegal conduct is a but-for cause of obtaining evidence). Additionally, it should be noted that probable cause to arrest Defendant existed because of the indictment of Defendant returned against him by a Grand Jury in the Eastern District of New York.

       Due process therefore does not provide Defendant with grounds for dismissal.

       **b.**    **International Law**

       Defendant has argued, somewhat puzzlingly, that his motion to dismiss should be granted based on the terms of the Canada-U.S. extradition treaty – puzzling because Cournoyer voluntarily left Canada and went to Mexico, and it was from Mexico that he was brought to the U.S. Defendant has therefore argued the wrong document, although the reason why Defendant has not based his case around the U.S.-Mexico extradition treaty is readily apparent.

       In *Alvarez-Machain* the Supreme Court reaffirmed both the *Ker-Frisbie* rule and a narrow exception to that rule for defendants brought within the jurisdiction of a court by procedures that violate the terms of an extradition treaty. *Alvarez-Machain*, 504 U.S. at 659-670 (citing *United States v. Rauscher*, 119 U.S 407 (1886)). The *Alvarez-Machain* Court also examined the Mexico-U.S. extradition treaty – which is still in force today – and determined that while the treaty established procedures to facilitate the transfer of prisoners, it did not contain a

7

prohibition on self-help, i.e. abduction. *Id.* at 663-666. The court refused to imply such a term from the general body of international law. *Id.* at 668.

Had Defendant argued that the Mexico-U.S. extradition treaty prohibited abduction and torture, his claim would have been foreclosed by *Alvarez-Machain*. Defendant has not made this argument. Rather, Defendant has argued that his expulsion from Mexico violated the U.S. extradition treaty with Canada. Defendant has not, however, pointed the court towards any term of the Canada-U.S. extradition treaty that prohibits the the U.S. from securing the transfer of Canadian citizens held by the government of Mexico. International law therefore does not provide Defendant Cournoyer with grounds for dismissal.

### c. **The Fourth Amendment**

Defendant Cournoyer has also claimed that the Mexican authorities subjected him to excessive force in violation of the Fourth Amendment to the U.S. Constitution. *See Tennessee v. Garner*, 471 U.S. 1 (1980). This claim must be denied without an evidentiary hearing because (i) dismissal would not be a proper remedy for a Fourth Amendment violation, *Crews*, 445 U.S. at 474, (ii) the Fourth Amendment does not apply to the actions of foreign officials, *Stowe v. Devoy*, 588 F.2d 336, 341(2d Cir. 1978), and (iii) the Fourth Amendment does not apply the actions of U.S. officials when the actions occur outside the U.S. and target non-U.S. citizens with no voluntary connection to the U.S., *see United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990). Because Cournoyer is a Canadian citizen who was subjected to the actions of Mexican authorities – actions that cannot plausibly be imputed to the U.S. government – he is not protected by the Fourth Amendment, which would not, in any case, afford him the remedy he seeks.

### 2. **Motion to Sever**

Cournoyer has moved to sever his trial from that of his co-defendants on the grounds (a) that his defense and those of his co-defendants will be mutually exclusive, and (b) that he will suffer spillover prejudice as a result of the admission against his co-defendants of evidence that is not admissible against him.

Federal Rule of Criminal Procedure 8(b) allows for the joinder of defendants alleged to have "participated in the same act or transaction." Generally, "a non frivolous conspiracy charge is sufficient to support joinder of defendants under [Rule] 8(b)." *United States v. Nerlinger*, 862 F.2d 967, 973 (2d Cir. 1988). Federal Rule of Criminal Procedure 14 provides for the severance of defendants if it appears to the court that a defendant is prejudiced by joinder.

A defendant seeking severance has the burden of proving "facts demonstrating that he will be so severely prejudiced by a joint trial that it would in effect deny him a fair trial." *United States v. An-Lo*, 851 F.2d 547, 556 (2d Cir. 1988). Indeed, the Supreme Court has instructed that "when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). *See also Richardson v. Marsh*, 481 U.S. 200, 210 (1987) (noting that both fairness and judicial economy are served by the joint trial of defendants indicted together).

Cournoyer first argues that his defense and those of his co-defendants will be mutually exclusive. Defenses are mutually exclusive "when accepting one defense requires that the jury must of necessity convict a second defendant." [2] *United States v. Yousef*, 327 F.3d 56, 151 (2d

---

[2] Concurring in *Zafiro*, Justice Stevens explained defenses at cross-purposes are not mutually antagonistic unless acceptance of one defense necessarily precludes acceptance of the other. *Zafiro*, 506 U.S. at 541-542. Mutual claims of ignorance as to the contents of a box being transported by two people were not mutually antagonistic because it remained possible that "both persons lacked the knowledge of the contents." *Id.*

9

Cir. 2003) (quoting *United States v. Cardascia*, 951 F.2d 475, 484 (2d Cir. 1991)). Even where defenses are mutually exclusive, severance is not *per se* required. *Zafiro*, 506 U.S. at 538-539. Jury instructions will often suffice to cure prejudice. *Id.* at 541 (citing *Richardson*, 541 U.S. at 211); *United States v. Harwood*, 998 F.2d 91, 96 (2d Cir. 1993). Defendant states that the "presumed defense for [Cournoyer's] co-defendants is to place blame on the alleged leader, Mr. Cournoyer." *Defendant Jimmy Cournoyer Memorandum of Law in Support of his Motion to Sever*, pp. 2-3 (hereinafter "*Motion to Sever*"). This bald conjecture is unsupported by specifics concerning defense theories that Cournoyer's co-defendants might plausibly advance and is insufficient to show that joinder will deny Cournoyer "a fair trial." [3] *An-Lo*, 851 F.2d at 556. *See also United States v. Forde*, 699 F.Supp.2d 637, 645 (S.D.N.Y. 2010).

Defendant next argues that severance is required because evidence that the government will present against his co-defendants will "inflame the jury" against him. *Motion to Sever*, pp. 3-4. Spillover prejudice can occur "[w]hen defendants are tried together in a complex case but have markedly different degrees of culpability," *Zafiro*, 506 U.S. at 539 (citing *Kotteakos v. United States*, 328 U.S. 750, 774-775 (1946)), or when evidence is admitted "that is probative of a defendant's guilt but technically admissible only against a co-defendant," *id.* (citing *Bruton v. United States*, 391 U.S. 123 (1968)). This case presents neither of these situations. Prejudicial spillover justifying severance is "an unlikely occurrence when all the defendants are charged under the same conspiracy count." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998).

---

[3] Defendant has offered no argument as to why a strategy of blame the leader is a plausible defense to the charges in this case. This case is therefore not like *United States v. Copeland*, 336 F.Supp.2d 223, 223-225 (E.D.N.Y. 2003) (Block, J.), in which defendant A represented to the court that he would present neutral, third party testimony exculpating himself and inculpating defendant B, or like *United States v. Basciano*, 2007 WL 3124622 *8-9 (E.D.N.Y. 2007) (Garaufis, J.), in which defendant A's "blame the co-defendant" strategy had been revealed by testimony elicited in a related trial. Nor is the present case comparable with *United States v. Mayfield*, in which two men were discovered in an apartment with a quantity of drugs. *Mayfield*, 189 F.3d 895, 899-901 (9th Cir. 1999). Defendant A's defense was that defendant B was the ringleader, had purchased the drugs and had possession of the drugs. *Id.* Defendant A's counsel vigorously prosecuted this defense. *Id.* The Ninth Circuit held that the defenses were mutually exclusive, that severance was required, and reversed defendant B's conviction. *Id.*

Cournoyer is charged in every count of the indictment and is alleged to have led an international narcotics and money laundering conspiracy. The government has represented that all the evidence at trial will be admissible against him. Further, Cournoyer is not faced with the prejudice of being tried alongside defendants whose alleged culpability is greater than his own. *See eg. United States v. DiNome*, 954 F.2d 839, 844 (2d Cir. 1992) (reversing convictions of defendants tried on charges of mail and wire fraud alongside RICO defendants charged with "vicious murders, loansharking, auto theft, pornography, and firearms trafficking"); *United States v. Burke*, 789 F.Supp.2d, 395, 399 (E.D.N.Y. 2011) (severance warranted where defendant charged with witness tampering alongside co-defendants charged in violent RICO conspiracy spanning three decades) (Johnson, J.). Defendant Cournoyer has therefore not met his burden of showing that he will suffer spillover prejudice if he is tried alongside his alleged co-conspirators.

### 3. Motion for Change of Venue

Defendant has moved the court under Federal Rule of Criminal Procedure 21(b) to transfer venue to the Northern District of New York. For the reasons stated below, the motion is denied.

"As a general rule, a criminal prosecution should be retained in [its] original district." *United States v. U.S. Steel Corp.*, 233 F.Supp. 154, 157 (S.D.N.Y. 1964). However, Rule 21(b) provides for the transfer, on defendant's motion, of a criminal proceeding to another district in which the charged offense occurred, if the court determines that such a transfer is "in the interest of justice." Fed. R. Crim. P. 21(b). In *Platt v. Minnesota Mining and Mfg. Co.*, 376 U.S. 240 (1964), the Supreme Court approved of ten factors that courts may consider when deciding a motion under Rule 21(b): (1) Location of the defendant; (2) location of the witnesses; (3) location of the events at issue; (4) location of documents and records; (5) disruption of

defendant's business; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket conditions in each district; and (10) any special elements. *Platt*, 376 U.S. at 243. No single factor is dispositive and the court should strike a balance that places weight on those factors that have the greatest relevance to the particular case. *United States v. Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990). The defendant bears the burden of justifying a transfer under Rule 21(b). *United States v. Wilson*, 2001 WL 798018 *1 (S.D.N.Y. 2001).

Neither Defendant nor the government disputes that venue would be proper in both the E.D.N.Y. and the N.D.N.Y. Whether change of venue is appropriate is therefore to be determined by consideration of the *Platt* factors, of which the first, second, third, seventh and eighth are the most relevant to this case.

While courts should strive to try defendants "where they reside," *United States v. Russell*, 582 F.Supp. 660, 662 (S.D.N.Y 1984), this is not always possible. The Defendant's hometown is Laval, Canada, which is not part of any United States judicial district. Further, the N.D.N.Y. is not more accessible than the E.D.N.Y. from Laval. Laval, a suburb of Montreal, is located at a distance of over 200 miles from any of the N.D.N.Y.'s trial courts, whereas the E.D.N.Y. is readily accessible by air.[4] *See U.S. Steel*, 233 F.Supp. at 158 ("The efficiency of modern air transportation renders rather sterile any argument based on differences in distances from the respective courthouses."). Further, Defendant is incarcerated pending trial in the E.D.N.Y. The first factor does not favor change of venue.

The whereabouts of both the defendant's and the government's witnesses is relevant to the question of transfer. Again, however, the defendant's burden will not be met by a bare

---

[4] The N.D.N.Y. has trial courts in Albany, Syracuse, Binghamton, and Utica. The E.D.N.Y. is served by two airports offering flights from Montreal: La Guardia and JFK.

recitation of distance. To meet his burden under this factor the defendant must offer concrete examples of expected testimony and demonstrate that he is financially incapable of paying the witnesses' travel expenses. *See United States v. Spy Factory, Inc.*, 951 F.Supp. 450, 456-457 (S.D.N.Y. 1997) (Sotomayor. J.). Defendant Cournoyer has asserted the intention to call "a number of witnesses … from Canada." *Memorandum of Law in Support of Motion of Transfer to the United States District Court for the Northern District of New York*, p. 10 (hereinafter "*Motion to Transfer*"). The government, in its turn, asserts that the "majority" of its witnesses reside in the E.D.N.Y., and that it might call witnesses from the Central District of California, the Southern District of Florida, the N.D.N.Y., and from Canada. *Government's Response in Opposition to Defendant Cournoyer's Pretrial Motions*, p. 42 (hereinafter "*Government's Response*"). Neither party has provided a witness list. However, Defendant has the burden of demonstrating that that he is financially incapable of transporting witnesses to the E.D.N.Y., and that trial in the N.D.N.Y. would be less onerous. He has not met this burden. It is significant that this is a trial that will likely involve witnesses who will travel from points across the continent, and New York City, as a major transport hub, is particularly suited to receive them. This factor does not favor either party.

Transfer of venue may be in the interest of justice where the "nerve center" of the conduct charged in an indictment is in a district other than the original district. *Russell*, 582 F.Supp. at 663; *United States v. Templin*, 251 F.Supp.2d 1223, 1225 (S.D.N.Y. 2003). In the case at bar, the scope of the alleged conspiracy extends from coast to coast and across the border into Canada. The government alleges that crucial events in the conspiracy – the storage and distribution of the marijuana – occurred in the E.D.N.Y. While it is true that the government has alleged that narcotics passed through the N.D.N.Y., this forms only part of the alleged

13

international scheme. This factor therefore does not favor either party. *See United States v. Guastella*, 90 F.Supp.2d 335, 339 (S.D.N.Y. 2000) ("[B]ecause the criminal activity that was alleged to have occurred in this case was national and even international in scope … the location of events at issue favors neither party.").

The fourth and fifth factors carry little weight in this case. The government has represented that all documentary evidence is located at the United States Attorney's Office in Brooklyn, New York. *Government's Response*, p. 46. However, the ease of modern transportation means that the location of relevant documents is "not as influential today as in the past." *United States v. Layne*, 2005 WL 1009765 (S.D.N.Y. 2005). Accordingly, this is a neutral factor. Similarly, modern communications may alleviate disruption to a defendant's business. *Spy Factory*, 95 F.Supp. at 458-459. Here, a trial in the N.D.N.Y. would prove no less disruptive to Defendant's business than would a trial in the E.D.N.Y.

Before the relative cost of trial in two districts becomes a relevant consideration, the moving party must make a showing that the cost of trial in the original district would be unduly onerous to this particular defendant. *See Valdes*, 2006 WL 738403 *7 (S.D.N.Y. 2006). Defendant argues that the cost of "travel, board, and accommodation are increased exponentially" in the E.D.N.Y. *Motion to Transfer*, p. 15. However, Defendant has neither shown that litigation in the E.D.N.Y. would be more expensive than in the N.D.N.Y., nor that he would be unable to bear such expenses.[5] *See Spy Factory*, 95 F.Supp. at 459 n. 4 ("[T]here has been no evidence adduced from which the Court could conclude that [the defendant] has

---

[5] Indeed, because air travel from Montreal to New York City is less expensive than air travel from Montreal to Albany, Syracuse, Binghamton, or Utica, and because defendant Cournoyer's defense counsel is located in New York City, litigation in the E.D.N.Y. might well be less expensive for defendant Cournoyer than it would be in the N.D.N.Y.

insufficient funds to provide for his defense or his sustenance at a trial in New York City."). This factor does not favor transfer.

The seventh *Platt* factor – location of counsel –favors retention of the case in the E.D.N.Y. Cournoyer is currently represented in New York City by John Meringolo, Esq., of 375 Greenwich Street, New York, New York. Nevertheless, Defendant argues that a transfer of venue to the N.D.N.Y. would facilitate communication with an unnamed French speaking attorney in Montreal who "has been representing defendant Cournoyer since 2001." *Motion to Transfer*, p. 16. Cournoyer has not demonstrated how venue in the N.D.N.Y. would aide his trial preparations.

Factor eight – the relative accessibility of the place of trial – favors retaining the case in the E.D.N.Y., particularly given the likelihood that witnesses will travel nationally and internationally to attend the trial.

Factor nine – docket conditions – carries no weight in this case. Defendant has based his argument under this factor on a mere recitation of the number of cases – criminal and civil – filed in the E.D.N.Y. and the N.D.N.Y. Although the E.D.N.Y. has a heavier caseload, it also has more judges.

In determining the appropriateness of transfer, the court should also consider any special elements of the case not covered by the other factors. In this case it is particularly relevant that Cournoyer, alone amongst the defendants, has moved for a transfer of venue. Severance of Cournoyer's case from that of his codefendants would require the government to prove its case multiple times. Judicial economy would not be served by a transfer of venue.

Several factors favor retaining the case in the E.D.N.Y., and no factors clearly favor change of venue. Transfer of venue to the N.D.N.Y. is therefore not in the interest of justice.

**CONCLUSION**

For the reasons stated above, Defendant's motions (1) to dismiss the indictment without prejudice for violation of due process, violation of international law, and unlawful attainment of jurisdiction over the person; (2) to sever; and (3) to transfer the case to the Northern District of New York are denied.

**SO ORDERED**

<u>S/</u>

SANDRA L. TOWNES

United States District Judge

Dated: December 14, 2012
      Brooklyn, New York